SA:SK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

FOWZI NAJI TAREB,
       also known as "Ozzie,"

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

TO BE FILED UNDER SEAL

COMPLAINT AND
AFFIDAVIT IN
SUPPORT OF
APPLICATION FOR
ARREST WARRANT

(T. 18, U.S.C., §§ 2, 641)

EASTERN DISTRICT OF NEW YORK, SS:

       ELIZABETH GREANEY, being duly sworn, deposes and states that she is a Special Agent with the United States Department of Agriculture, Office of Inspector General ("USDA-OIG"), duly appointed according to law and acting as such.

       Upon information and belief, in or about and between January 2014 and February 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant FOWZI NAJI TAREB, also known as "Ozzie," together with others, did embezzle, steal, purloin, and knowingly convert to his use or the use of another, and without authority, sell, convey, and dispose of a record, voucher, money, or thing of value of the United States or of any department or agency thereof, to wit: the United States Department of Agriculture, Food and Nutrition Service.

       (Title 18, United States Code, Sections 2 and 641)

The source of your deponent's information and the grounds for her belief are as follows:[1]

1.      I am a Special Agent with the United States Department of Agriculture, Office of Inspector General ("USDA-OIG") and have been a Special Agent with USDA-OIG since January 2011. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for federal food stamp benefit offenses in the United States. I have attended training at the Federal Law Enforcement Training Center in Glynco, Georgia, and obtained a Master of Science degree in Forensic Science. Working as a Special Agent, I have been involved in numerous investigations relating to food stamp benefit fraud, food stamp benefit trafficking and other violations of federal law, including violations of Title 7, United States Code, Section 2024 and Title 18, United States Code, Sections 371 and 641. These investigations are conducted both in an undercover and overt capacity. During the course of these investigations, I have conducted surveillance, executed search warrants, debriefed witnesses, and reviewed documents related to fraud schemes. I have received training in various investigative techniques including, but not limited to, the execution of search warrants. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

2.      I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested warrant, I have not set forth each and every fact learned during the course of the investigation.

my own observations, reports made to me by other law enforcement officers, and review of

records from USDA-OIG and other government agencies. In addition, when I rely on

statements made by others, such statements are set forth only in part and in substance unless

otherwise indicated.

       3.     USDA-OIG is investigating unlawful food stamp benefit fraud.

Specifically, USDA-OIG is investigating individuals and entities that unlawfully process

food stamp benefits without being authorized to do so by the USDA and unlawfully

exchange cash for food stamp benefits.

BACKGROUND

A.    The "SNAP" Program and Authorized Retailers

       4.     The federal government, through the United States Department of

Agriculture, Food and Nutrition Service ("USDA-FNS"), administers the Supplemental

Nutrition Assistance Program ("SNAP").

       5.     SNAP was formerly called and known as the "Food Stamp Program."

SNAP utilizes federal tax dollars to subsidize low-income households, affording such

households the opportunity to achieve a more nutritious diet by increasing their

food-purchasing power. SNAP is the new name of the Food Stamp Program, as a result of

the Food, Conservation, and Energy Act of 2008 (P.L. 110-246), also known as the Farm

Bill. The new name, effective October 1, 2008, more accurately reflects the program's

mission to provide food assistance and nutrition education to assist participants as they move

to a healthier lifestyle and self-sufficiency.

       6.     In New York, individuals who receive SNAP benefits ("Recipients")

no longer redeem their benefits by using paper food stamps coupons. Recipients now

redeem their SNAP benefits electronically through the use of what is known as an Electronic

Benefits Transfer ("EBT") card. The SNAP EBT cards operate much like automated teller

machine (ATM) cards used by banks. At the beginning of each month, a Recipient's EBT

card is credited with a dollar amount of food stamps benefits for that month.

    7. The EBT cards are used by Recipients to purchase eligible food items

at retail food stores ("retailers") that are authorized by FNS to participate in SNAP and have

EBT terminals located in the stores. As a purchase is made, the retailer runs the EBT card

through the EBT terminal. The Recipient enters a personal identification number ("PIN") on

a keypad, and the amount of the purchase is deducted from the Recipient's EBT card. The

EBT terminal generates a receipt for each transaction, and the balance remaining in the

Recipient's account for the month is displayed on the receipt. The amount of the Recipient's

purchase is then electronically credited to the retail food store owner's bank account, via

previous arrangements between the retailer or representative and the FNS.

    8. SNAP benefits may be accepted by authorized retailers only in

exchange for eligible food items. According to FNS regulations, most edible items, with the

exception of prepared foods, vitamins, and medicines, are eligible for purchase with SNAP

benefits. Items such as beer, cigarettes, paper goods, and soaps are not eligible for purchase

with SNAP benefits and it is a violation of the rules and regulations governing SNAP to

allow SNAP benefits to be used to purchase ineligible items. SNAP benefits may not

lawfully be exchanged for cash under any circumstances. Exchanging SNAP benefits for

cash is known as "trafficking," and is a violation of the rules and regulations governing

SNAP. Lastly, retailers may not permit Recipients to run credit accounts and pay off such

accounts with SNAP benefits from their EBT cards. Doing so is a violation of the rules and regulations governing the SNAP.

        9.     All retailers, prior to receiving authorization to participate in SNAP and to process EBT transactions for Recipients, must submit to FNS an Application for Authorization to Participate in SNAP. By executing the application, the applicant attests that he has read the Warnings & Certification that is sent to retailers along with the application documents. The Warnings & Certification provides that, by his/her signature on the application, the applicant is attesting to understanding that he/she, and the persons on behalf of whom the application is submitted, are responsible for ensuring that all employees at the store, both paid and unpaid, comply with SNAP rules and avoid engaging in unauthorized activity, that SNAP authorization may not be transferred to new owners, partners, or corporations, that an unauthorized individual or firm accepting or redeeming SNAP benefits is subject to substantial fines and administrative sanctions, and that violations of SNAP rules can result in criminal prosecution and sanctions. This application, the truthfulness of which must be affirmed by the applicant, also requires the applicant to disclose certain information about the applicant's store to FNS so FNS can determine whether the applicant is eligible to participate in SNAP. The required information includes, inter alia, the store's actual or estimated annual gross sales and food sales, the types of products sold, the number of individuals employed, the quantity and type of cash registers used, and the bank account designated to deposit all SNAP proceeds. All applicants also receive training from FNS regarding proper conduct as a participating retailer in SNAP. The training makes clear that SNAP prohibits exchanging SNAP benefits for cash and selling ineligible items.

10.     SNAP benefits may be accepted only by retailers authorized to participate in SNAP by FNS. Once FNS authorizes a retailer to accept SNAP benefits, FNS issues the retailer a SNAP permit and a unique authorization number (the "FNS authorization number"). FNS uses the FNS authorization number to identify the retailer and track redemptions. A retailer that does not possess a SNAP permit and FNS authorization number may not accept or redeem SNAP benefits. Each store location must have a separate SNAP permit. If a store changes ownership, moves, or closes, its SNAP permit is void. A SNAP permit is not transferable.

11.     A typical, legitimate transaction, utilizing an EBT card, would occur as follows: an authorized Recipient, carrying his or her own EBT card, would enter a retail store authorized by FNS to accept SNAP benefits. The Recipient would gather non-prepared food items that are eligible for purchase with SNAP benefits. The Recipient would present those items to the store clerk for purchase, along with his/her EBT card. The clerk would add the total cost of all items presented for purchase and enter that amount into the store's EBT terminal. The EBT card would then be "swiped" as is done with credit and ATM cards, the Recipient would enter a secret personal identification number, and, if the EBT card had a SNAP balance sufficient to cover the purchase total, the transaction would be completed. The total amount of the purchase would be electronically deducted from the Recipient's card balance. That same amount also would be electronically transferred to the retailer's designated bank account, using federal funds that originate from FNS.

12.     As a result of my training and experience, I have become familiar with a number of schemes employed by individuals and entities to defraud SNAP. Sometimes retailers permit Recipients to purchase ineligible items with SNAP benefits, charging

Recipients a premium for allowing them to do so. Sometimes retailers permit Recipients to run credit accounts, often involving ineligible items, and to pay off such accounts using SNAP benefits and their EBT cards. Sometimes retailers exchange SNAP benefits for cash, which as explained above, is known as trafficking.

13.    Retailers who exchange SNAP benefits for cash usually do so at a discounted rate, e.g., 50 to 70 percent of the full value of the SNAP benefits. For example, a retailer engaging in trafficking would enter a $100 transaction against a Recipient's EBT card balance and give the Recipient only $50 or $70 in cash, depending upon the discount rate. This practice results in profiteering by traffickers, misuse of government funds intended to provide food for needy families, and the creation of a market for stolen or fraudulently obtained SNAP benefits.

14.    JP Morgan Chase is the EBT-processing company in New York, responsible for EBT transactions and recordkeeping. A retailer may obtain an EBT terminal from JP Morgan Chase or from a third-party vendor. A retailer may obtain more than one EBT terminal for a particular store, and each EBT terminal may be connected to a separate bank account, even though it shares the same FNS authorization number. In a typical transaction, an authorized retailer accepts SNAP benefits from a Recipient and, through wire transfers from JP Morgan Chase, receives dollar-for-dollar credit from USDA-appropriated funds; if the retailer utilized an EBT terminal obtained from a third-party vendor, the retailer then remits a fee to the third-party vendor.

15.    Many retailers are aware that FNS is able to detect and monitor certain types of suspicious EBT transactions. Large SNAP transactions of $100 or more, especially those that total an even-dollar amount, are one such category of transactions that can raise

suspicion and invite scrutiny. Accordingly, retailers who engage in trafficking often attempt

to avoid detection by running two or more EBT transactions within a short time period, often

just a minute or two apart. For example, a retailer engaging in trafficking might run two

back-to back transactions in the amounts of $61.91 and $58.09. Doing so enables the retailer

to run a large, even-dollar total transaction (i.e., $120) without an even-dollar amount

showing up in the transaction record (i.e., $61.91 and $58.09). FNS, however, is now able to

track these rapid or "back-to-back" transactions. Sometimes a retailer will insist that

Recipients leave their EBT cards with the retailer and provide their personal identification

numbers to the retailer. This enables the retailer to engage in trafficking by running several

relatively small EBT transactions with the Recipients' cards over an extended period of time

-- perhaps days -- thereby making it difficult for FNS to detect the trafficking.

B.    The Defendant and His Scheme with the Unauthorized Retailers

16.    Century Payments Inc., a WorldPay Company ("WorldPay"), is a

payment processing company. It is also a third-party vendor and distributor of EBT

terminals. WorldPay charges a fee per EBT transaction conducted on one of its EBT

terminals.

17.    The defendant, FOWZI NAJI TAREB, is an Agent of WorldPay.

TAREB solicits retailers to enter into contracts with WorldPay for payment processing

services and provides retailers with EBT terminals. In return for facilitating these contracts

and providing retailers with EBT terminals, TAREB receives compensation from WorldPay.

18.    As further set forth below, through the course of my investigation, I

have learned that TAREB uses his position with WorldPay to knowingly supply EBT

terminals to retailers that are not authorized to accept SNAP benefits and to facilitate those

retailers' unauthorized acceptance and redemption of SNAP benefits.

        19.    As part of my investigation, I surveilled various locations where EBT

terminals are located. On or about December 16, 2013, I visited the retailer Candy &

Grocery Corp. located at 2827 Cropsy Avenue, Brooklyn, New York ("Candy & Grocery

Corp."). At the retailer, I observed an advertisement for EBT transactions; the advertisement

had on it the name "Ozzie" and the telephone number 917-856-4750 ("TAREB's telephone

number").[2] I interviewed a clerk in the retailer; the clerk stated, in sum and substance and

relevant part, that one of his brothers operated the retailer. I left a telephone number ("my

contact telephone number") with the clerk and asked that his brother contact me.

        20.    Later that day, I received a telephone call at my contact telephone

number from TAREB's telephone number. The caller identified himself as "Ozzie."

Based on my investigation, "Ozzie" is FOWZI NAJI TAREB.[3] During the calls, TAREB

stated, in sum and substance and relevant part, that: he had been an Account Executive at

WorldPay for six years, and he used EBT terminals provided by WorldPay for processing

EBT transactions at Candy & Grocery Corp.

---

      [2] I observed the same advertisement at a retailer located at 1208 Nostrand
Avenue, Brooklyn, New York. In December 2013, both Candy & Grocery Corp. and the
retailer located at 1208 Nostrand Avenue, Brooklyn, New York were authorized SNAP
participants and used EBT terminals.

      [3] A search of law enforcement databases and records from AT&T revealed that
TAREB's telephone number is associated with FOWZI NAJI TAREB. WorldPay personnel
records for TAREB list his name as "Ozzie." In addition, I have reviewed the New York
State driver's license of FOWZI N. TAREB and compared the photograph to video footage
of the individual known as "Ozzie" and they appear to be the same person.

21.     On or about January 23, 2014, a confidential informant working with USDA-OIG ("CI-1")[4] called TAREB's telephone number from a cellular telephone provided by USDA-OIG ("CI-1's telephone number") and spoke with TAREB. CI-1, in sum and substance and relevant part, identified himself as the operator of a retailer located in Jamaica, New York ("CI-1's retail location" or "his retail location"), indicated that his retail location was not authorized by FNS to accept SNAP benefits, and asked whether he could, nevertheless, obtain an EBT terminal for his retail location. TAREB asked, in sum and substance and relevant part, how CI-1 had obtained TAREB's name and TAREB's telephone number. CI-1 responded that he had obtained the information from a delivery driver in his area. TAREB stated that he would have to call CI-1 back in about five minutes. The telephone call then ended.

22.     Approximately five minutes later, CI-1's telephone number received a telephone call from TAREB's telephone number. CI-1 did not answer the call and let the telephone call go to voicemail. Immediately afterwards, CI-1, using CI-1's telephone number, called TAREB's telephone number and spoke with TAREB. TAREB answered the call and asked for more information about how CI-1 had obtained TAREB's name and TAREB's telephone number. CI-1 responded, in sum and substance and relevant part, that

---

[4] CI-1's information has been corroborated by independent evidence, including consensual recordings, telephone records, and observations by law enforcement. Specifically, law enforcement officers conducted audio-recordings of each of CI-1's telephone calls with TAREB discussed in this affidavit and audio- and video-recordings of each of CI-1's meetings with TAREB discussed in this affidavit. Where conversations occurred in Arabic; I received a summary translation for purposes of this investigation. CI-1 has prior convictions for assault and disorderly conduct. During debriefing, CI-1 advised the government that CI-1 had been involved in allegations of theft of public money from a state lottery system. CI-1 acts as an informant in exchange for assistance in facilitating FNS authorization for his retail location. Prior to this investigation, CI-1 acted as an informant in exchange for payment.

he had obtained the information from a delivery driver who gave the information to CI-1 after CI-1 had told the driver about problems his retail location was having with the USDA and EBT terminal. CI-1 further stated that, two weeks prior, his retail location's EBT terminal had stopped working because he did not respond to reauthorization requests from the USDA. TAREB stated, in sum and substance and relevant part, that because the machine was government-owned, the government would ask a lot of questions and request a lot of information, and that if CI-1's retail location obtained an EBT terminal owned by a private company then the retail location would not have to answer all of those questions. TAREB further stated, in sum and substance and relevant part, "don't worry I'll come hook you up." CI-1 and TAREB agreed to meet on January 30, 2014 at CI-1's retail location.

23.     On January 30, 2014, at approximately 12:51 p.m., CI-1, using CI-1's telephone number, called TAREB's telephone number, identified himself, and asked when TAREB would be arriving at CI-1's retail location. TAREB stated, in sum and substance and relevant part, that he would arrive in 25 minutes to an hour.

24.     Later that day, at approximately 1:47 p.m., CI-1 entered his retail location from the rear entrance. CI-1 observed TAREB at the front of his retail location. CI-1 and TAREB then engaged in the following conversation, in sum and substance and relevant part:

a.     CI-1 showed TAREB the USDA paperwork requesting information required to reauthorize his retail location to participate in SNAP. CI-1 explained that his retail location was owned by his uncle, who he indicated was in Yemen, and that, as a result, CI-1 would not be able to get the information to the USDA in a timely manner, but would be able to do so in March when his uncle returned. CI-1 further explained that his

retail location was losing money and clients due to the absence of an EBT terminal, and that the retail location had already stopped using its debit/credit card machine due to cost.

        b.      TAREB explained that he had a "girl in the bank" who helped him and stated that he needed $1,000 cash in order to hook up an EBT terminal. The $1,000 cash was separate and apart from the fee ordinarily charged by WorldPay for installation of an EBT terminal. TAREB further stated that he would only profit $300 from the deal because he had to pay the "girl" as well. TAREB further explained the fees associated with use of the EBT terminal: 6 cents for every EBT transaction and 5 cents for every debit or credit card transaction. TAREB stated that he required a voided check, $100 upfront to start the process, and information to complete the application, including the owner/operator's name, date of birth, and social security number. TAREB instructed CI-1 to text the information to TAREB's telephone number. TAREB also requested a copy of the retail location's business certificate and the debit/credit card machine that the retailer had stopped using (see supra ¶ 24(a)). TAREB stated that he would return Monday or Tuesday to set up the new EBT terminal and advised that the terminal would only be for temporary use until the retail location could get its paperwork in and become reauthorized.

        c.      TAREB asked CI-1 if the retail location conducted "illegal transactions" including exchanging SNAP benefits for cash. CI-1 responded that people had asked to engage in such transactions but that he was too scared to do it. TAREB stated, in sum and substance and relevant part, that CI-1 should get to know people first and that, once he did, he could carry out such transactions.

     d.     TAREB asked CI-1 again how CI-1 had obtained TAREB's name and TAREB's telephone number. CI-1 stated that a delivery driver who works along Jamaica Avenue in Queens, New York gave him the information.

     e.     CI-1 asked TAREB about his competition. TAREB stated that another individual was providing EBT terminals but that the other provider was not reliable.

     25.     Between January 31, 2014 and February 3, 2014, I engaged in a text message conversation using CI-1's telephone number. On January 31, 2014, I sent a text message from CI-1's telephone number to TAREB's telephone number with the information TAREB requested to complete the application: the name of CI-1's retail location, as well as its owner/operator's name, date of birth, and social security number. On February 2, 2014, TAREB, using TAREB's telephone number, sent a text message to CI-1's telephone number requesting the "Address on I'd," apparently requesting the address on the owner/operator's identification card. On February 3, 2014 (a Monday), I, using CI-1's telephone number, exchanged the following text messages with TAREB's telephone number:

| | |
|---|---|
| CI-1: | 1220 Ocean Ave Apt 3C Brooklyn, NY 11230 |
| TAREB: | OK |
| CI-1: | Good 4 2morrow? Wat time? |
| TAREB: | Inshallah |
| TAREB: | 4-5 o'clock |

     26.     On February 4, 2014 (a Tuesday), between approximately 4:30 p.m. and 7:45 p.m., I, using CI-1's telephone number, exchanged the following text messages with TAREB's telephone number:

| | |
|---|---|
| CI-1: | What time r u coming cause I don't want to keep the |

money in the store

| | |
|---|---|
| TAREB: | Few hours I'm in Bronx |
| CI-1: | Will it be later than 8? |
| TAREB: | K |
| CI-1: | What going on are you coming or not cos I have to leave after 1 hour |
| TAREB: | I'm still in Bronx |
| CI-1: | Call me |
| TAREB: | Few minute |

27.     On February 4, 2014, at approximately 7:48 p.m., TAREB, using
TAREB's telephone number, called CI-1's telephone number.  CI-1 answered the call and
CI-1 and TAREB discussed the new EBT terminal that TAREB would provide for CI-1's
retail location.  TAREB explained, in sum and substance and relevant part, that: he was in
the Bronx hooking up a couple of machines; he was unable to do them the previous day
because of a snow storm; and that his cousin also had an issue with a machine and that he,
TAREB, had to help his cousin as well.  TAREB promised to be at CI-1's retail location on
Wednesday.  TAREB and CI-1 agreed to meet at CI-1's retail location at 4:00 p.m. on
Wednesday, February 5, 2014.  CI-1 stated to TAREB that if TAREB did not come to the
meeting, CI-1 wanted his money back.  CI-1 further explained that he was losing clients and
really wanted to get this done soon.

28.     On February 5, 2014 (a Wednesday), at approximately 4:05 p.m., I,
using CI-1's telephone number, exchanged the following text messages with TAREB's
telephone number:

CI-1:       Where you at

TAREB:    On my way

29.    On February 5, 2014, at approximately 4:55 p.m., TAREB arrived at

CI-1's retail location and met with CI-1. CI-1 and TAREB then engaged in the following

conversation, in sum and substance and relevant part:

a.    TAREB asked CI-1 whether CI-1 had received a box with a

machine in it. CI-1 responded that he had not. TAREB explained that CI-1's retail location

could use one of the terminals that TAREB had with him for now. TAREB further explained

that when CI-1 received the box from the company, CI-1 should call or text TAREB so that

TAREB could retrieve his terminal.

b.    TAREB went behind the counter of CI-1's retail location and

connected an EBT terminal, which also accepted debit and credit cards.

c.    Subsequently and in CI-1's presence, TAREB made a telephone

call to WorldPay to activate the EBT terminal. TAREB asked to speak with a particular

female individual, who was not available; instead, another individual spoke with TAREB and

helped him activate the EBT terminal.

d.    TAREB used a test debit/credit card that he had with him to test

the EBT terminal. He swiped the test debit/credit card through the EBT terminal and kept

the receipts.

e.    TAREB then asked if CI-1 had an EBT card. CI-1 responded

that he did not. TAREB asked a few patrons in CI-1's retail location if they had EBT cards,

and they responded that they did not. TAREB then referenced text messages in his cellular

telephone and accessed what appeared to be three EBT card numbers and their associated

personal identification numbers ("PINs") and first names. TAREB opened the text message

for "Julio" and entered the EBT card number in the text message and associated PIN to

process a 1 cent purchase through the EBT terminal. While doing so, TAREB stated, in sum

and substance and relevant part, that the guy had $27 on the card yesterday and now only had

$9. When CI-1 asked TAREB why he was running a transaction for only 1 cent, TAREB

responded that he could not take more from the card because the guy would notice it.[5]

        f.      CI-1 gave TAREB $900 in U.S. currency.[6] TAREB did not

count the money, immediately placed the money in his pocket, and stated to CI-1, "I trust

you."

        g.      TAREB then showed CI-1 how to use the EBT terminal he had

installed and indicated that the terminal did not require a password.

        h.      TAREB reiterated that the EBT terminal he had provided to

CI-1 was temporary and that it might take a month or so after CI-1's retail location was

reauthorized for CI-1 to get an authorized terminal in place.

        i.      Before leaving, TAREB asked CI-1 if CI-1 knew anyone else

who needed a terminal for their store. CI-1 responded that he did not at that time.

        30.      Subsequently, CI-1 swiped three undercover EBT cards (provided by

me) through the unauthorized EBT terminal that TAREB had installed at CI-1's retail

location. Records from JP Morgan Chase indicate that the unauthorized EBT terminal was

associated with an FNS authorization number assigned to another retailer (rather than CI-1's

---

    [5] Records from JP Morgan Chase indicate that, on February 5, 2014, at
approximately 5:39 p.m., a 1 cent transaction was run on an EBT terminal located at CI-1's
retail location on an EBT card assigned to "Julio Mendez."
    [6] USDA-OIG agents provided CI-1 with $900 in U.S. currency immediately
prior to this meeting.

retail location); the other retailer was located in Brooklyn, New York and was authorized by FNS to participate in SNAP on January 30, 2014. Moreover, FNS records indicate that CI-1's retail location and TAREB were not authorized to employ that FNS authorization number. As set forth above, FNS authorization numbers are unique to the retailer and owner.

        31.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application. I believe that sealing these documents is necessary because, given the confidential nature of this investigation, disclosure would severely jeopardize the investigation in that it might alert the target of the investigation to the existence of an investigation and likely lead to the destruction and concealment of evidence and flight of the target.

        WHEREFORE, your deponent respectfully requests that a warrant issue for the arrest of the defendant FOWZI NAJI TAREB, also known as "Ozzie," so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that all papers submitted in support of this

application, including this complaint and affidavit, be sealed until further order of the Court.

Dated:    Brooklyn, New York
            September _18_, 2014

                                                             _____
                                               ELIZABETH GREANEY
                                             Special Agent, USDA-OIG

Sworn to before me on
the _18_ day of September, 2014

_____
THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK